# Exhibit 77

| | |
|---|---|
| **From:** | Ben-Jacob, Michael |
| **Sent:** | Thursday, March 1, 2012 5:57 PM |
| **To:** | Woodard, Arthur |
| **Subject:** | Argre Memo |
| **Attachments:** | US Tax Memo (60000826).DOCX |

\*\*\*

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Michael Ben-Jacob
KAYE SCHOLER LLP
425 Park Avenue | New York, New York 10022
T: +1 212.836.8310 | F: +1 212.836.6310
michael.ben-jacob@kayescholer.com | www.kayescholer.com

This message may contain confidential and/or legally privileged information from the law firm Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please notify the sender immediately by return email or by telephone (+1 212.836.8310) and delete the message, along with any attachments, from your computer. Thank you.

1

**CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER**

**WH_MDL_00368403**

# KAYE SCHOLER LLP

425 Park Avenue
New York, New York 10022-3598
212.836.8000
Fax 212.836.8689
www.kayescholer.com

**DRAFT**

## MEMORANDUM

**TO:**      [Hatzoloh EMS, Inc.]

**FROM:**  Kaye Scholer, LLP

| PRIVILEGED & CONFIDENTIAL |
| ATTORNEY CLIENT COMMUNICATION |

**DATE:**    April [_], 2011

**SUBJECT:**  U.S. Federal Income Tax Characterization of the German Share Transaction

---

This memorandum will address certain U.S. federal income tax consequences of a transaction (the "Transaction") pursuant to which Argre Management, LLC ("Argre"), each of its principals, namely, John H. van Merkensteijn, III, Matthew Stein, Richard Markowitz, and Jerome Lhote; Brean Murray Carret Group Inc. ("BMC"); Solo Capital Limited ("Solo"); David Rafi; and Robert Klugman (collectively, the "Investors") will contract with [Hatzoloh EMS, Inc.] (the "Charity") for the Charity to purchase at the Investors' behest certain shares of stock (the "Shares") of [_] ("Germanco"), as described in greater detail below.

The Transaction (described more fully below) will be executed pursuant to, Transaction Documents (defined below) on April [_], 2011 (the "Effective Date").

## IRS CIRCULAR 230 DISCLOSURE

To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

### Background

This memorandum is based on the facts, assumptions and representations set forth herein. We have examined and, to the extent we deemed proper, relied on the following documents:

> i.    the Indemnity Agreement dated as of April [_], 2011, by and between the Investors and the Charity (the "Indemnity Agreement");

CHICAGO · FRANKFURT · LONDON · LOS ANGELES · MENLO PARK · NEW YORK · SHANGHAI · WASHINGTON, DC · WEST PALM BEACH

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**        - 2 -                April [13], 2011

      **ii.**     the Investment Management Contract dated as of April [_],
2011, by and between the Charity and [Solo Capital
Limited] (the "Investment Manager") (the "I<u>nvestment
Management Contract</u>");

      **iii.**    the Swap Agreement dated as of April [_], 2011, by and
between the Charity and the Investors (the "<u>Swap
Agreement</u>");

      **iv.**    the International Swaps and Derivatives Association, Inc.
2002 Master Agreement dated as of April [_], 2011, by and
between [_] and [_] (the "<u>ISDA Agreement</u>"); and

      **v.**     such other documents as we deemed necessary for the
preparation of this opinion (collectively, the documents
described in clauses (i) through (v) are referred to herein as
the "<u>Transaction Documents</u>").

In addition, we have considered and relied upon the Internal Revenue Code of
1986, as amended (the "Code"),[1] the Regulations, administrative rulings, judicial decisions, and
procedures issued by the IRS and such other authorities as we have deemed appropriate. All
such authorities are subject to change, either prospectively or retroactively. In addition, we have
relied upon and assumed (without independent verification) the correctness of the statements and
opinions contained in the Transaction Documents.

      **Facts**

The Charity is an organization organized and operated exclusively for religious,
charitable, scientific, literary or educational purposes that is exempt from U.S. federal income
taxation pursuant to Section 501(c)(3). The Charity is established and maintained in the United
States and a resident of the United States for purposes of the double taxation agreement in place
between the United States and Germany (the "<u>Treaty</u>").

The Charity will execute the Transaction Documents and perform the Transaction
in such manner as to qualify for the tax exemption under Article 27 of the Treaty. In connection
with the Transaction, the following steps shall occur:

      1.   pursuant to the Swap Agreement, the Investors will transfer or cause to be
transferred to the Charity Eur[_] to be deposited at the direction of the

---

[1]    Unless otherwise indicated, all section ("<u>Section</u>" or "<u>§</u>") references are to the Code and
the regulations promulgated thereunder (the "Regulations" or "Treas. Reg."). All
references to "the IRS" or "the Service" are to the U.S. Internal Revenue Service.

**CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER**      **WH_MDL_00368405**

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**        - 3 -                      April [13], 2011

Investors into an account (the "Account") opened by the Charity with SEI Investments Company (the "Custodian");

2. pursuant to the Investment Management Agreement and the Swap Agreement, the Charity, at the direction of the Investors, will cause the Investment Manager to directly purchase [_] Shares on or before the dividend record date for the Eur[_] deposited in the Account, which Shares will be held in a segregated account of the Charity and will not be subject to circumstances (other than as described) affecting the beneficial and economic ownership of the Shares;

3. pursuant to the Investment Management Agreement, the Charity, at the direction of the Investors, will take a short futures position in [_] Shares by selling a cash-settled single stock future, which shall not expire until at least one day after the dividend record date (the "Futures Contract");

4. the Charity will receive a compensation payment from the Custodian, equal to the net dividend amount on the Shares of Eur[_] (the "Net Dividend Amount");

5. on behalf of the Charity, [Acupay] will file a tax reclaim with the German Federal Tax Office, in the amount of Eur[_], which is [_]% of the gross dividend;

6. pursuant to the Investment Management Agreement, the Charity, at the direction of the Investors, will cause the Investment Manager to sell the [_] shares in the market;

7. the Futures Contract will be cash settled in the amount of [_]; and

8. pursuant to the Swap Agreement, the Charity will pay the Net Dividend Amount to the Investors, (i) reduced by any fees associated with the Transaction, (ii) reduced (increased) by any loss (gain) incurred in connection with the Futures Contract and (iii) reduced by the amount of the Charity's agreed upon fixed return (the "Fixed Return").

These events viewed together shall be referred to herein as the "Transaction Steps".

Our analysis is dependent upon the accuracy and completeness of the facts, assumptions and representations, and our understanding of the terms of the Transaction Documents as stated herein. In the event any one of the facts, representations, assumptions, or terms is incorrect, in whole or in part, our analysis might be adversely affected.

**Issue**

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**        - 4 -                    April [13], 2011

You have requested our analysis concerning the following U.S. federal income tax issues associated with the Transaction:

1.  Whether the Transaction described herein, whereby pursuant to the Swap Agreement, the Charity purchases the Shares, when considered together with the terms of the Indemnity Agreement and the other Transaction Documents, should be treated as a purchase of the Shares by the Investors followed by a short sale of the Shares by the Charity, with the Investors as the short sale lender and the Charity as the short sale borrower.

2.  Whether the Fixed Return received by the Charity should be treated as "unrelated business tax income" or "UBTI" of the Charity or whether such Fixed Return should otherwise affect the Charity's U.S. tax-exempt status under Section 501(c)(3).

**Conclusions**

Based upon the facts, representations, reliances and assumptions contained herein:

1.  For U.S. federal income tax purposes, the Transaction described herein, should be treated as a purchase of the Shares by the Investors followed by a short sale of the Shares by the Charity, with the Investors as the short sale lender and the Charity as the short sale borrower.

2.  For U.S. federal income tax purposes, the Fixed Return received by the Charity should be treated as "unrelated business tax income" or "UBTI" of the Charity and such Fixed Return should not otherwise affect the Charity's U.S. tax-exempt status under Section 501(c)(3).

**Discussion and Analysis**

Set forth below are the "Discussion and Analysis" sections supporting the conclusions of this memorandum.

*Characterization of the Charity's Legal Title in the Shares: Ownership versus Borrowing*

If ownership of the Shares has transferred to the Charity, the Transaction is merely (i) a loan from the Investors to the Charity, (ii) a purchase of the Shares by the Charity with the proceeds of the loan, (iii) the receipt of the Share dividend by the Charity, (iv) a sale of the Shares by the Charity and (v) the repayment of the loan to the Investors, with the amount due under the loan being equal to the net proceeds from the Transaction less the Fixed Return. If the Investors are treated as the owners of the Shares, the Transaction should be treated for U.S. tax purposes as follows: (i) the Investors purchase the Shares; (ii) the Charity borrows the Shares from the Investor, (iii) the Charity enters into a cash-settled futures contract to sell the Shares on

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 5 -                    April [13], 2011

the day after the dividend is received by the Charity (iv) the Charity receives the Share dividend; (v) the Charity settles the futures contract with cash and returns the borrowed Shares to the Investors inclusive of the net dividend reduced by the Fixed Return; and (vi) the Investors sell the shares in the market.

   Ownership of property under U.S. tax law is not strictly a function of the form of the transaction.[2]  In determining the owner of property, the IRS has stated in published rulings that it is necessary to look to the substance of the transaction to determine whether there has been both a (i) <u>shift in the economic risk of loss</u> and (ii) <u>transfer of the other incidents of ownership</u>.[3]

   Further, "[a]lthough no absolute rule can be established to determine which party to a transaction will be considered the owner of the property involved in all situations because of the factual nature of the issue, as a general rule the party to the transaction that bears the economic burdens and benefits of the ownership, will be considered the owner of the property for U.S. federal income tax purposes", and not necessarily the party holding legal title to the property.[4]

   The IRS has published numerous rulings which indicate that the substance and not the form of the transaction will govern its tax treatment.  Therefore, in analyzing the Charity's acquisition of the Shares subject to the obligations under the Transaction Documents, the substance and underlying business effects of the transactions determines the proper tax treatment.

   An analysis of the incidents of ownership of the Shares (namely, the benefits and burdens of ownership and the economic risk of loss), indicates that the Transaction will more likely than not be treated as a purchase of the Shares by the Investors followed by a short sale of the Shares by the Charity.

   1.   Shift in the Economic Risk of Loss

   A shift in the economic risk of loss is deemed to occur when the buyer of the property takes on the risk of future losses in value of the property.  Generally, the likelihood that a transaction will constitute something other than a sale increases when a buyer of property is

---

[2] *See Comm'r v. Court Holding Co.*, 324 U.S. 331 (1945).

[3] *See* Rev. Rul. 79-195, 1979-1 C.B. 177; PLR 9237004 (Apr. 8, 1992).  Other than with respect to the taxpayers to whom the private letter rulings are issued, such rulings are not binding on the IRS, and cannot be cited as precedent, but they can provide useful information on how the IRS may treat similar transactions.

[4] Rev. Rul. 82-144, 1982-2 C.B. 34; *See also Frank Lyon Co. v. U.S.*, 435 U.S. 561 (1978); *Torres v. Comm'r*, 88 T.C. 702 (1987).

# KAYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 6 -                    April [13], 2011

protected under the purchase agreement and related documents from future losses with respect to the purchased property.

        Although not identical to our situation, a sale and repurchase transaction in which a security is sold subject to an agreement to repurchase the security at a fixed price generally is treated as a financing arrangement if the transaction economically resembles a loan secured by the security.[5]

        In Revenue Ruling 74-27, a bank agreed to purchase tax-exempt securities from a customer and then resell them to the same customer on or before a specified date. Following the form, the bank treated the transaction as a purchase of the tax-exempt securities and excluded the interest received on the tax-exempt securities from its taxable income. The IRS ruled that, under such a sale and repurchase agreement between the bank and its customer, no sale of the securities had occurred because the bank never acquired "true" ownership, despite receiving legal title, of the securities. The IRS stated that the bank protected itself from risk of loss on the securities through the terms of the agreement by making the customer ultimately liable for the principal amounts.

        The repurchase agreement in Revenue Ruling 74-27 was entered into in the context of the following facts and terms: (a) the same tax-exempt securities that were sold to the bank by the customer were required to be resold to that customer by a specific date; (b) upon failure of the customer to repurchase these tax-exempt securities, the bank could sell the securities, apply the proceeds of the sale to the repurchase obligation between the customer and the bank, and either credit the customer with any excess or hold him liable for any deficiency; (c) the customer was legally bound to repurchase the securities and to pay any deficiency remaining unpaid after the application of the proceeds of the sale; (d) the customer agreed to pay interest at a stipulated rate upon the amount advanced by the bank; and (e) the value of the securities may or may not have been equal to the amount advanced by the bank.[6]

        In the Transaction, although the Charity has legal title to the Shares, the Investors benefit from any increase in value of and income earned on (other than the Charity's Fixed Return), and bear all risk of loss associated with, the Shares, pursuant to the terms of the Indemnity Agreement and the other Transaction Documents. Thus, the "economic risk of loss" has not shifted from the Investors to the Charity, as can be seen from following terms and conditions of the Transaction.

---

[5]     *See* Rev. Rul. 74-27, 1974-1 C.B. 24; *First American National Bank of Nashville v. U.S.*, 467 F.2d 1098 (6th Cir. 1972); *Third Nat'l Bank of Nashville*, 71-1 USTC ¶ 9248.

[6]     *See also*, Rev. Rul. 79-108, 1979-1 C.B. 75; *First American Nat'l Bank of Nashville*, 467 F.2d 1098.

KAYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 7 -                              April [13], 2011

First, as a result of the Swap Contract, the Charity does not bear any risk of loss with respect to the ownership of the Shares, as the Swap Contract serves as a hedge by the Charity against any decrease in value of the Shares.  Second, pursuant to the Indemnity Agreement, the Investors will indemnify the Charity against any risk of claims being asserted against the Charity and the potential for litigation in respect of such claims.

Therefore, in light of the terms of the Transaction Documents, there has been no risk of loss shifted to the Charity.

2.        Transfer of Other Substantial Incidents of Ownership

In addition to the shifting of economic risk of loss, Revenue Ruling 79-195[7] and Revenue Ruling 82-144[8] indicate that other substantial indicia of ownership must also be considered.

Incidents of ownership include legal ownership, the right to enjoy capital appreciation in the securities, voting rights, the right to share in amounts on liquidation, and the right to sell the underlying property freely.

As discussed above, legal ownership alone is not considered determinative of tax ownership under U.S. tax law.[9]  Aside from the risk of loss, the other factors that are most important in determining tax ownership are whether or not the "buyer" has the right to share in any appreciation of the underlying property and whether it has the right to sell the underlying property freely.[10]

Pursuant to the Transaction Documents, the actions of the Charity will be directed by the Investors, and the Charity, therefore, does not have the right to sell the Shares other than in accordance with the Transaction Steps outlined above.  Moreover, just as the terms of the Transaction Documents protect the Charity against risk of loss, such terms also prevent the Charity from participating in any appreciation in the value of the Shares during the Charity's holding period of such Shares.  Pursuant to the Transaction Documents, any income earned with respect to the Shares (e.g., the Net Dividend) is for the benefit of and will be distributed to the Investors net of the Charity's Fixed Return, thereby providing the Charity with a fixed return that does not vary based on any increases or decreases in the value of the Shares.

---

[7]        1979-1 C.B. 177.

[8]        1982-2 C.B. 34.

[9]        *See Comtel Corp. v. Comm'r*, 45 T.C. 294 (1965) *aff'd* 376 F. 2d 791 (2nd Cir. 1967).

[10]        *See Id.*; Rev. Rul. 79-195.

CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER                              WH_MDL_00368410

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 8 -                              April [13], 2011

Accordingly, based on the terms of the Indemnity Agreement and the other Transaction Documents, it is more likely than not that the Charity will not be considered to have acquired sufficient incidents of ownership of the Shares, and therefore, will not be considered the owner of the Shares for U.S. tax purposes.

3.        Substance Over Form Discussion

Although, as discussed above, the Transaction should be treated as a purchase of the Shares by the Investors followed by a short sale of the Shares by the Charity for U.S. federal income tax purposes, an issue may arise whether the Charity and the Investors can argue that the substance of the Transaction (a purchase of the Shares by the Investors followed by a lending of the Shares from the Investors to the Charity in connection with the Charity's short sale of the Shares) should govern its tax treatment notwithstanding the form (a loan from the Investors to the Charity and a purchase of the Shares by the Charity) chosen and implemented by the parties.

Courts have recognized that the characterization of a transaction for tax purposes may differ from its form.[11]  In general, the tax treatment of a transaction is determined by its economic substance and not by its form[12] and it is well established that the Commissioner of the IRS may look through the form of a transaction to its substance.[13]  However, since the taxpayer has the opportunity to structure the transaction as it sees fit, courts have held that the circumstances under which a taxpayer may disavow the form of a transaction in favor of its substance are more limited. [14]

Generally, the Tax Court and several of the Circuits have subjected taxpayers to a higher standard of proof before permitting them to contradict a written contractual provision to establish the substance of a transaction.  To contradict a contractual provision, the courts have required either (i) "strong proof" that the substance of the transaction is other than is indicated by the contractual provision, or (ii) "proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc" (the "Danielson rule").[15]

---

[11]        *See Frank Lyon Co. v. United States*, 435 U.S. 561 (1978).

[12]        *See Gregory v. Helvering*, 293 U.S. 465, 470 (1935), *aff'g* 69 F. 2d 809 (2d Cir. 1934).

[13]        *See Id.*

[14]        *See generally Comm'r v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974); *Bolger v. Comm'r*, 59 T.C. 760, 767 n.4 (1973).

[15]        *Compare Ullman v. Comm'r*, 264 F.2d 305 (2d Cir. 1959) with *Comm'r v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), *cert. denied*, 389 U.S. 858 (1967).

# KAYE SCHOLER LLP

Argre Management, LLC - **DRAFT**              - 9 -                    April [13], 2011

In this regard, the U.S. Supreme Court has held that the more restrictive Danielson rule should not apply to a sale and lease-back transaction,[16] which is somewhat analogous to the Transaction. Instead, in analyzing the substance of sale and lease-back transactions, ownership of the property for tax purposes depends on who bears the balance of the benefits and burdens of ownership.[17]

As discussed in more detail above, the courts have specifically addressed sale-repurchase agreements, and where the terms of the agreements have been deemed not to result in a transfer of ownership, the courts have treated these agreements as financing arrangements (also somewhat analogous to the Transaction).[18] The courts also have given weight to the substance and the business purpose of the arrangements in determining whether these arrangements are financing arrangements or sales.[19] As discussed above, under the case law and relevant revenue rulings,[20] the Investors have (i) retained the risk of loss and (ii) retained sufficient incidents of ownership of the Shares such that the economic substance of the Transaction should be an acquisition of the Shares by the Investors followed by the Investors lending the Shares to the Charity in connection with the Charity's short sale for U.S. federal income tax purposes. As

---

[16]   *See, e.g., Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939) (the Supreme Court upheld a merchant's depreciation deductions for department store buildings, notwithstanding a written agreement under which the merchant transferred ownership of the buildings to a trustee bank. Invoking substance over form, the Court ruled the transfer "was actually a loan secured by the property involved"). *See also Frank Lyon Co. v. United States,* 435 U.S. 561 (1978).

[17]   *See Illinois Power Co. v. Comm'r*, 87 T.C. 1417 (1986) (taxpayer had entered into a sale lease-back transaction for nuclear fuel with a 50% owned subsidiary and both parties consistently reported the transaction as a financing arrangement for tax purposes. The Tax Court rejected the IRS' contention that the Danielson rule should apply. Instead, the Tax Court held that the taxpayer had the burden of producing "strong proof" that the taxpayer had retained the benefits and burdens of ownership, a standard of proof that the court defined as somewhat more than a preponderance and somewhat less than the strict Danielson rule. Based on the terms of the transaction, the Tax Court concluded that the taxpayer had presented strong proof that it remained the owner of the property and the substance of the transaction prevailed over its form.)

[18]   *See Sheldon v. Comm'r*, 94 T.C. 738 (1990); *American Nat'l Bank of Austin v. U.S.*, 421 F.2d 442 (5th Cir. 1970); *Third Nat'l Bank of Nashville v. U.S.*, 71-1 USTC ¶ 9248.

[19]   *See Comtel Corp. v. Comm'r*, 45 T.C. 294 (1965) *aff'd* 376 F.2d 791 (2nd Cir. 1967); *Citizens Nat'l Bank of Waco v. U.S.*, 551 F.2d 832 (Ct. Cl. 1977); *Sheldon*, 94 T.C. 738.

[20]   *See* Rev. Rul. 79-195 and Rev. Rul. 74-27.

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 10 -                    April [13], 2011

such, the Transaction should not result in the Charity being treated as the owner of the Shares for U.S. tax purposes.

Therefore, even though the form of the Transaction is structured as a [loan from the Investors] to the Charity followed by a purchase of the Shares by the Charity, it is more likely than not that the Transaction will be treated, consistent with its substance, as a purchase of the Shares by the Investors followed by a loan of such Shares to the Charity pursuant to a short sale of the Shares by the Charity. The Charity and the Investors should be able to establish strong proof that the Transaction is an acquisition of the Shares by the Investors and a short sale of such Shares by the Charity for U.S. federal income tax purposes, because (1) the economic substance of the Transaction is an acquisition of the Shares by the Investor followed by a short sale of such Shares by the Charity instead of a purchase of such Shares by the Charity, (2) the nature and documentation of the transaction reflects the intent of the parties that the Transaction be treated as an acquisition of Shares by the Investors with a short sale of such Shares by the Charity, and (3) the Charity and the Investors will treat the Transaction as a purchase of the Shares by the Investors with a short sale of such Shares by the Charity for all U.S. federal income tax purposes.

*UBTI and Tax-Exempt Status Issues Regarding Fixed Return*

Income from investments by tax-exempt organizations potentially is subject to tax as UBTI under Section 512. Generally, income will be included in a tax-exempt organization's UBTI if (i) such income arises from an unrelated trade or business, defined in Section 513 as any trade or business the conduct of which is not substantially related to the exercise or performance by such organization of its exempt purposes or (ii) such income is incurred with respect to "debt-financed property" under Section 514.

1.          Debt-Financed Property Rules

Section 514 provides that certain income and deductions that would otherwise be excluded from the scope of UBTI must be included in UBTI because the income is incurred with respect to debt-financed property. In applying Section 514, an exempt organization must (i) determine whether "acquisition indebtedness" exists with respect to property owned by the exempt organization and if so, (ii) determine whether any income is derived from such debt-financed property.

Acquisition indebtedness generally includes indebtedness incurred in connection with the acquisition or improvement of property, regardless of whether the debt is incurred before, after, or at the time of the acquisition or improvement.[21] In determining whether a

---

[21]        Section 514(c)(1).

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**           - 11 -                     April [13], 2011

transaction gives rise to indebtedness for purposes of the debt-financed property rules, the courts and the IRS typically focus on the substance of the transaction.[22]

   For example, in Revenue Ruling 95-8, the IRS ruled that neither gain nor rebate fees received by an exempt organization in connection with the short sale of stock constitute debt-financed income because, although a short sale creates an obligation on the part of the organization, such obligation does not constitute indebtedness within the meaning of Section 514. The exempt organization ("E") in the Revenue Ruling sought to profit from the decline in value of "A Corp" stock. On Date 1, the value of the A Corp stock was $5x per share. To effectuate a short sale, E borrowed 100 shares of A Corp stock through its broker and sold the shares. The sales proceeds and any income earned thereon were retained by the broker as collateral for E's obligation to return 100 shares of A Corp stock. E was also required to place additional cash collateral with the broker. The funds for the additional collateral came from E's operating funds and were not borrowed by E. During the duration of the short sale, the broker credited E's account with a rebate fee representing a portion of the income earned on the collateral funds. On Date 2, at which time the value of the stock had declined to $4x per share, E closed the short sale by purchasing 100 shares of A Corp stock for $400x, realizing a gain on the short sale transaction of $100x. The Revenue Ruling held that neither the gain on the short sale transaction nor the rebate fee constituted debt-financed income because E did not incur indebtedness on the transaction. If, however, the additional cash collateral was funded with money borrowed by E, a portion of the income from the short sale transaction could have been treated as giving rise to debt-financed property income subject to the UBTI tax.

   If, as discussed above, the Transaction is characterized for U.S. tax purposes as an acquisition of the Shares by the Investors followed by a short sale of the Shares by the Charity, the borrowing of the Shares by the Charity in connection with the short sale should not be treated as acquisition indebtedness of the Charity. Therefore, assuming such characterization, the Fixed Return received by the Charity in connection with the Transaction should not be treated as giving rise to debt-financed property income subject to the UBTI tax.

---

[22] *See Siskin Memorial Foundation v. U.S.*, 603 F. Supp. 91 (E.D. Tenn. 1984), *aff'd*, 790 F.2d 480 (6th Cir. 1986). A charitable foundation owned more than 800 life insurance policies as investment property. The policies were contributed to the foundation by donors who continued to pay the annual premiums. The foundation withdrew the accumulated cash value under the policies and invested the proceeds in marketable securities and other income producing investments. Although the organization was charged an annual fee on the amounts withdrawn, it was not obligated to repay the withdrawals; however, the amount payable on death of the insured was reduced by any amounts withdrawn. The court held that the cash withdrawals constituted acquisition indebtedness.

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 12 -          April [13], 2011

   If, however, the Charity is not treated as having entered into the short sale transaction, the Transaction would likely be characterized as the Investors buying the Shares and paying a fee equal to the Fixed Return to the Charity for services performed by the Charity in facilitating the Transaction on behalf of the Investors.

   2.  Unrelated Trade or Business Rules

   As discussed above, income generally will be included in a tax-exempt organization's UBTI if such income arises from an unrelated trade or business, defined in Section 513 as any trade or business the conduct of which is not substantially related to the exercise or performance by such organization of its exempt purpose. Specifically, gross income from an activity carried on by an exempt organization is subject to the UBTI tax if (i) the activity constitutes a "trade or business", (ii) the activity is "regularly carried on" by the organization, and (iii) the conduct of the activity is "not substantially related" to the performance of the organization's exempt function.[23]

   The term "trade or business" includes any activity that is carried on for the production of income from the sale of goods or the performance of services.[24] The principles used to determine whether an activity constitutes a trade or business under Section 162 apply for UBTI purposes. Under Section 162(a), a business expense deduction is allowed for ordinary and necessary expenses paid or incurred during a taxable year in carrying on a trade or business. A "trade or business" generally refers to any activity engaged in for the primary purpose of generating a profit. Making a substantial profit over a period of time is considered strong evidence of a profit motive.[25] In *Prof'l Insurance Agents of Mich. v. Commissioner*, the Tax Court held that the determinative consideration under the trade or business requirement is whether an organization engaged in the activity with an intent to earn a profit.[26]

   As the Charity entered into the Transaction to receive the Fixed Return, the Charity should be viewed as having a profit motive, and the services performed by the Charity in connection with the Transaction should be viewed as a trade or business.

---

[23]  Treas. Regs. Section 1.513-1(a).

[24]  Section 513(c).

[25]  *See U.S. v. American Bar Endowment*, 477 U.S. 105 (1986) (considerable income derived from sponsorship of group insurance programs for members by organization formed to advance legal research and promote administration of justice).

[26]  78 T.C. 246 (1982), *aff'd*, 726 F.2d 1097 (6th Cir. 1984).

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 13 -                    April [13], 2011

   The second requirement for application of the UBTI tax is that the trade or business be regularly carried on by the exempt organization.[27]  In determining whether a business activity is regularly carried on within the meaning of this requirement, the most important considerations are the frequency and continuity with which he activities are conducted and the manner in which the activities are pursued.[28]

   A one-time event in which an exempt organization participates is not generally considered to be a regularly carried on trade or business.[29]  In Private Letter Ruling 200621027, involving an educational organization that focused on aerospace education and a veterans organization that conducted various educational activities and provided insurance to its veteran members, the two organizations engaged in a reorganization by which the veterans organization transferred its investment assets and educational programs to the educational organization, which thereafter would conduct its own educational activities, as well as the educational activities formerly conducted by the veterans organization.  The IRS ruled that the reorganization was not a regularly carried on trade or business because it was a one-time event that was not ongoing and would not continue to occur in the future.

   Based on our understanding, the Transaction is a one-time event being entered into by the Charity, and the Charity does not intend, and will not continue, to engage in transactions similar to the Transaction.  Therefore, even assuming that the performance of services by the Charity in connection with the Transaction is "not substantially related" to the performance of the organization's exempt function, it is more likely than not that the Charity will not be treated as regularly carrying on a trade or business, and the Fixed Return received by the Charity will not be subject to the UBTI tax.

   3.  Insubstantial Non-Exempt Activities

   In order for an organization to qualify for tax-exempt status under Section 501(c)(3), the organization must be operated exclusively for one or more exempt purposes.  Based on the regulations, an organization will be operated exclusively for exempt purposes only if it engages "primarily" in activities that further its exempt purpose.  The organization may only engage in non-exempt activities to an insubstantial degree.[30]

---

[27]  Section 512(a)(1).

[28]  Treas. Regs. § 1.513-1(c)(1).

[29]  *See Museum of Flight Found v. U.S.*, 63 F. Supp. 2d 1257 (W.D. Wash. 1999) (one-time lease of historic jet aircraft to aircraft manufacturer for use in testing new engines was held not to be a regularly carried on trade or business).

[30]  Treas. Reg. Section 1.501(c)(3)-1(c)(1).

KAYE SCHOLER LLP

Argre Management, LLC - **DRAFT**          - 14 -                              April [13], 2011

Generally, in determining whether an activity is incidental to an organization's tax-exempt activities, the following three factors are considered:  (i) the amount of income derived from the activity in comparison to total income; (ii) the amount of expenditures for the activity in comparison to total expenditures; and (iii) the amount of time the organization's employees devote to the activity in comparison to total hours worked.[31]

Of particular relevance to the Charity is the income prong of the operational test. Although there is no bright line rule for determining when an activity is no longer insubstantial, if more than 25%-30% of the organization's gross income is derived from an activity not primarily in furtherance of the organization's exempt purposes, the organization risks the IRS's challenge based on failure to comply with the operational test.[32]  In Private Letter Ruling 8040014, the IRS privately ruled that the sale or rental of consigned artworks by a museum did not jeopardize the museum's exemption where the sale/rental operation was only 4% of gross income of all of the museum's activities, because 4% was held to be insubstantial.  Courts, however, have specifically declined to establish percentage thresholds for application of the operational test.[33]

Whether an activity is insubstantial is a question of fact to be decided in light of all relevant facts and circumstances.  Presumably, however, by granting some leeway for "an insubstantial part" of it activities, the regulations presumably tolerate sporadic nonexempt activities.

Based on the above, if the Charity's income arising from the Transaction is less than 25% of the Charity's revenue for the year and the Charity does not and will not regularly engage in transactions substantially similar to the Transaction, the Charity's income arising from the Fixed Return should be viewed as insubstantial.  If, however, the Charity's income arising from the Transaction exceeds 25% of the Charity's total income for the year, there is some risk

---

[31]  *See Bethel Conservative Mennonite Church v. Comm'r*, 80 T.C. 352 (1983), *rev'd*, 746 F.2d 388 (7th Cir. 1984); *Orange County Agricultural Society, Inc. v. Comm'r*, 893 F.2d 529 (2d Cir. 1990); and *Nationalist Movement v. Comm'r*, 37 F.3d 216 (5th Cir. 1994).

[32]  See TAM 200203069 (activities were not insubstantial where organization received 75% of its income through providing nonexempt Internet services); *Associated Master Barbers & Beauticians of America, Inc. v. Comm'r*, 69 T.C. 53 (1977) (revocation of tax exemption where approximately 30% of revenue derived from nonexempt activity); *Orange County Agricultural Society, Inc. v. Comm'r*, 893 F.2d 529 (2d Cir. 1990) (revocation of tax exemption where approximately 30% of revenues were from an unrelated business activity); and *Bethel Conservative Mennonite Church v. Comm'r*, 80 T.C. 352 (1983) (revocation of tax exemption where expenditures for a nonexempt purpose averaged 22% annually).

[33]  *See Spanish American Cultural Association of Bergenfield*, TC Memo 1994-510 (1994).

**K**AYE SCHOLER LLP

Argre Management, LLC - **DRAFT**         - 15 -                        April [13], 2011

that the IRS will consider the income from arising from the Fixed Return as being substantial, in which case, the Charity's tax-exempt status under Section 501(c)(3) could be at risk.

**CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER**                        **WH_MDL_00368418**